**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| COLON HEALTH CENTERS OF AMERICA, LLC, and WASHINGTON IMAGING ASSOCIATES—MARYLAND, LLC (d/b/a PROGRESSIVE RADIOLOGY), <br><br>      Plaintiffs, <br><br> vs. <br><br> BILL HAZEL, in his official capacity as Secretary of Health and Human Resources, *et al.*, <br><br>      Defendants. | Civil Action No. 1:12-cv-615-CMH-TCB |

---

**PLAINTIFFS' OPPOSITION TO
STATE DEFENDANTS' MOTION TO DISMISS**

---

**INSTITUTE FOR JUSTICE**
William H. Mellor* (DC Bar No. 462072)
Robert J. McNamara (VA Bar No. 73208)
Darpana M. Sheth* (NY Bar No. 4287918)
Lawrence G. Salzman* (CA Bar No. 224727)
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel: (703) 682-9320
Fax: (703) 682-9321
E-mail: rmcnamara@ij.org; wmellor@ij.org; dsheth@ij.org; lsalzman@ij.org
*Attorneys for Plaintiffs*
*\* Admitted Pro Hac Vice*

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................3

STATEMENT OF FACTS ....................................................................................................4

*1. Plaintiffs Are Prevented from Providing Medical Services in Virginia* ...............................4

*2. The Certificate-of-Need Law Imposes Huge Burdens and Achieves Nothing Beyond Sheer Economic Protectionism* ..................................................................................................8

ARGUMENT ....................................................................................................................10

I.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT VIRGINIA'S CERTIFICATE-OF-NEED PROGRAM VIOLATES THE DORMANT COMMERCE CLAUSE ...........................................11

   A.  The Complaint Sufficiently Alleges That Virginia's Certificate-of-Need Program Discriminates Against Interstate Commerce ....................................12

   B.  The Complaint Sufficiently Alleges that Virginia's Certificate-of-Need Program Places Clearly Excessive Burdens on Interstate Commerce............15

II.  THE COMPLAINT SUFFICIENTLY ALLEGES THAT THERE IS NO RATIONAL BASIS FOR THE CERTIFICATE-OF-NEED PROGRAM OR FOR ITS UNEQUAL APPLICATION ...............17

   A.  The Complaint States a Claim Under the Equal Protection Clause ..............20

   B.  The Complaint States a Claim Under the Due Process Clause ......................21

      1.  The Complaint Sufficiently Alleges That There is No Logical Connection Between Restricting the Supply of Medical Facilities and Decreasing Medical Costs or Increasing Access to Medical Care................................22

      2.  The Complaint Sufficiently Alleges That the Public Harm Imposed By The Certificate-of-Need Program Vastly Outweighs Any Plausible Public Benefit ...........................................................................................24

      3.  The Complaint Alleges That Virginia's Certificate-of-Need Program Only Achieves an Illegitimate End: Economic Protectionism ..................25

III. PLAINTIFFS ARE PRESERVING THEIR PRIVILEGES OR IMMUNITIES CLAIM UNDER THE FOURTEENTH AMENDMENT ........................................................................27

   CONCLUSION ................................................................................29

Plaintiffs Colon Health Centers of America, LLC ("Colon Health Center") and Washington Imaging Associates – Maryland ("Progressive Radiology") respectfully submit this brief in opposition to State Defendants' Motion to Dismiss Plaintiffs' Complaint for Failure to State a Claim.

## INTRODUCTION

Plaintiffs, two out-of-state medical providers who want to offer the same medical services in Virginia that they already provide in other states, bring this constitutional challenge to the state's "certificate of need" requirement, which stands squarely in their way.  In a detailed 41-page complaint, Plaintiffs allege how Virginia's certificate-of-need program imposes enormous financial costs and delays on anyone who seeks to provide certain medical services or purchase certain medical equipment.  They allege that the certificate-of-need process is intended to—and, in fact, does—benefit in-state businesses at the expense of out-of-state businesses by allowing established businesses to intervene in (and indirectly control the burdens imposed by) the process.  They allege that this program presents, at minimum, a huge barrier (and, for Plaintiffs as well as many others, an insurmountable one) to offering new services or purchasing the restricted equipment in interstate commerce—and that it does so while achieving no public benefits.  Further, Plaintiffs allege that the state arbitrarily applies these requirements to some services and equipment but not to other similar services or equipment.  And they allege that the state does all this for no conceivable reason beyond an illegitimate protectionist motive.  Any one of these allegations, if proven true, is enough to entitle Plaintiffs to relief under the Constitution of the United States.

In their motion (which relies almost exclusively on cases decided at summary judgment or after trial), Defendants effectively ask the Court to ignore these specific allegations and hold

3

that Plaintiffs have somehow failed to state a claim upon which relief can be granted.  This would be error.  As demonstrated more fully below, Plaintiffs have more than adequately pled plausible claims for relief under the dormant Commerce Clause and Fourteenth Amendment, and they are entitled, under Rule 8's liberal pleading requirement, to have their claims decided on a full factual record.  Defendants' motion should, therefore, be denied.

## STATEMENT OF FACTS

Each plaintiff alleges different facts to support their common claims that Virginia's certificate-of-need program violates the Constitution.  But they face a common injury: Virginia's certificate-of-need program is so overwhelmingly burdensome, time-consuming, and uncertain that it acts as an effective barrier to their offering in Virginia the same medical services they provide in other states.  But for that program, no other law (including the many other regulations and licensing restrictions Virginia places on the practice of medicine in an effort to protect the public health and safety) would present any obstacle to their planned services.  For purposes of this Motion, only two basic facts are necessary:  First, Plaintiffs are prevented from providing medical services in Virginia by the state's certificate-of-need requirement.  Second, that requirement imposes massive burdens, generates no real benefits, and is so arbitrary and illogical as to be unconstitutionally irrational.

### 1. *Plaintiffs Are Prevented from Providing Medical Services in Virginia.*

Dr. Mark Baumel founded Colon Health Centers in order to provide individuals with a new screening model for colorectal cancer ("colon cancer") that would save lives.  (Compl. ¶ 47.)  Colon cancer is the second-leading cause of cancer deaths in the United States, killing 50,000 Americans and nearly 1400 Virginians each year.  (*Id.* ¶ 48.)  The true tragedy, though, is that 90 percent of these deaths are preventable through proper screening methods because pre-

4

cancerous polyps, if detected early, can be removed before they slowly transform into cancer. (*Id.* ¶ 49.)  Although cancer guidelines recommend that every individual get screened by the time he or she reaches the age of 50, fewer than 50 percent of at-risk individuals get screened because of disadvantages of the two current screening methods:  optical colonoscopy and virtual colonoscopy.  (*Id.*  ¶¶ 50-51.)

As an invasive procedure, optical colonoscopy requires giving the patient anesthesia and then physically inserting an approximately six-foot tube attached to a camera into a patient's rectum.  (*Id.* ¶ 54.)  As the tube is advanced through the colon, the doctor, most commonly a gastroenterologist ("GI physician"), views the lining of the patient's colon on a screen.  (*Id.*)  If a polyp or other abnormality is detected, as occurs in about 15 to 20 percent of patients, the GI physician can immediately remove the polyp.  (*Id.*)  However, the procedure poses real risks, including adverse reactions to the anesthesia, infection, severe bleeding, or, in rare cases, a perforation of the colon that requires an immediate operation.  (*Id.* ¶ 56.)  Additionally, optical colonoscopy requires several hours of recovery, and patients are not advised to resume normal work, driving, or other activities for the remainder of the day.  (*Id.* ¶ 57.)

The second screening method, virtual colonoscopy, involves the patient lying down on an examination table while a high-capacity CT-scanner takes multiple, cross-sectional images that a computer combines to form a three-dimensional image of the patient's colon.  (*Id.* ¶ 59.)  Because virtual colonoscopy is noninvasive, it allows the 80 to 85 percent of screened individuals without any detected abnormality to avoid the medical risks and discomfort of optical colonoscopy.  It has the drawback, however, of requiring a second visit to a GI physician in order to remove detected polyps in about 15 to 20 percent of patients.  (*Id.* ¶ 62-64.)

In a new approach to colon-cancer screening and treatment designed to be the best of both worlds, Dr. Baumel has combined the advantages and convenience of noninvasive virtual colonoscopy with the capacity for immediate removal of polyps offered by optical colonoscopy. (*Id.* ¶ 65.)  Under this new model, trademarked as Integrated Virtual Colonoscopy, Colon Health Centers would partner with local GI physicians to open a "one-stop shop" for colon health services, equipped with a CT-scanner.  (*Id.* ¶ 67.)  Patients come into the colon health center for a virtual colonoscopy; their scan is immediately sent electronically to Colon Health Centers' team of dedicated radiologists (who would be located in Ohio and licensed in Virginia), who interpret and then report the results within 30 to 45 minutes.  (*Id.* ¶ 68.)  Abnormalities can then be treated immediately, without requiring a second appointment, while patients without any abnormality can resume their regular activities.  (*Id.*)

Currently, Dr. Baumel offers this innovative medical service at his flagship facility in Delaware—where, since its opening in 2008, approximately 4,000 patients have received virtual colonoscopies with the option of receiving same-day treatment.  (*Id.* ¶ 71.)  Dr. Baumel also recently partnered with New Jersey-based GI physicians to offer Integrated Virtual Colonoscopy in that state.  (*Id.*)  Unfortunately for patients in Virginia, the CT scanners that Integrated Virtual Colonoscopy requires cannot be purchased in this state without first obtaining a certificate of need.  Consequently, plans to open three colon health centers in Virginia were stymied in 2009 when the State Health Commissioner denied each of the three proposed centers' certificate-of-need applications after allowing established businesses and would-be competitors to intervene and oppose the applications.  (*Id.* ¶¶ 146-156.)  The expense, delay, and complete uncertainty of the certificate-of-need process make it impossible for Dr. Baumel to partner with other doctors in Virginia to purchase CT scanners.  (*Id.* ¶ 158.)  Because (and only because) of the certificate-of-

6

need requirement, Dr. Baumel does not currently have partnerships with Virginia-based GI physicians or have contracts to build new facilities or purchase CT scanners.  (*Id.* ¶ 159.)

While Virginia's certificate-of-need program has prevented Dr. Baumel from providing *new* medical services to Virginia, it has blocked Dr. Mark Monteferrante and the other Virginia-licensed doctors at Progressive Radiology from offering the *same* services they (until recently) had offered to patients in Virginia for the past 25 years.  (*Id.* ¶¶ 14, 80-86.)

Progressive Radiology offers cost-effective medical imaging services throughout Maryland and the District of Columbia.  (*Id.* ¶ 74.)  Dr. Monteferrante and his partners specialize in interpreting MRI scans to diagnose orthopedic and neurological injuries (*Id.* ¶ 75.)  For years, Progressive Radiology provided all of the professional radiology physician services for a medical imaging center in Northern Virginia.  (*Id.* ¶ 80.)  In 2003, Dr. Monteferrante and his partners assisted the owner of that center in their attempt to obtain a certificate of need for a second MRI machine to the busy office.  (*Id.* ¶ 161.)  That process, which simply sought permission to add capacity to an existing successful facility, involved two separate denials, took five years, and cost roughly $175,000 in filing fees, consultant fees, and attorney expenses before the center was allowed to purchase a second MRI scanner.  (*Id.* ¶ 162.)  At each stage of the five-year battle, existing, competing diagnostic imaging centers opposed the application and increased the difficulty of the process.  (*Id.* ¶ 164.)

When that medical imaging center was sold to Inova Health Systems, an enormous healthcare conglomerate based in Virginia, Progressive Radiology decided to start a center of its own to continue serving patients in Northern Virginia.  (*Id.* ¶¶ 82-85.)  However, Virginia prohibits Progressive Radiology from opening this new office or even purchasing the MRI scanner unless it first obtains a certificate of need.  (*Id.* ¶ 86.)   Because the certificate-of-need

process is expensive and time-consuming (and because established in-state businesses, including

Inova Health Systems, will be able to intervene in and increase the burden of the proceedings),

Progressive Radiology simply cannot afford to invest in applying for permission to purchase an

MRI scanner in Virginia.  (*Id*. ¶¶ 165-67.)

## 2. *The Certificate-of-Need Law Imposes Huge Burdens and Achieves Nothing Beyond Sheer Economic Protectionism.*

Certificate-of-need requirements originated in the mid-1960s as a response to state and

local efforts to allocate federal funding for the creation of hospitals in order to ensure the

financial viability of hospitals built with taxpayer dollars.  (Compl. ¶ 87.)  Premised on the

purported ability to control healthcare costs by restricting supply and dividing the provision of

healthcare services into discrete geographical regions, certificate-of-need requirements, in

practice, effectively insulated existing hospitals from new competition.  (*Id*. ¶ 88.)  After the

American Hospital Association began a nationwide lobbying campaign supporting certificate-of-

need requirements (*Id*. ¶ 90), in 1974 Congress required states to adopt a certificate-of-need

program in order to receive certain federal healthcare subsidies.  (*Id*. ¶ 92.)  In 1986, Congress

repealed this requirement in light of three developments:  (i) the restructuring of

Medicare/Medicaid reimbursement to a fee-for-service system eliminated the rationale for these

programs; (2) mounting evidence demonstrated that certificate-of-need programs actually

increased healthcare costs; and (3) certificate-of-need programs produced detrimental effects as

local officials took myopic or parochial views of what kind of medical services a community

"needed."  (*Id*. ¶ 96.)  Despite this federal repeal, local lobbying efforts have kept some form of

certificate-of-need requirement in place in 36 states, including Virginia.  (*Id.* ¶ 101.)

Virginia's certificate-of-need program is one of the most restrictive in the country

because it:  (1) covers the broadest categories of medical services and equipment (while still

exempting favored goods and services); and (2) imposes one of the longest and most complicated review processes, which allows established healthcare businesses to oppose applications and delay the review process with an onerous fact-finding conference.

First, the statutory definitions highlight the broad coverage of Virginia's certificate-of-need requirement, which applies to any healthcare "project." The term "project" includes but is not limited to nine categories of activities, including, but not limited to: (i) establishing a medical facility; (ii) introducing into an existing medical care facility any new healthcare service, including CT scanning and MRI; and (iii) adding specified medical equipment to a medical care facility, including a CT or MRI scanner. (Compl. ¶ 106-107 (citing Va. Code § 32.1-102.1).) Moreover, the statute enumerates a lengthy list of "medical care facilities" subject to review, including "[s]pecialized centers or clinics or that portion of a physician's office developed for the provision of . . . computed tomographic (CT) scanning, . . . [and] magnetic resonance imaging." (Compl. ¶ 108 (citing Va. Code § 32.1-102.1). ) Despite the broad scope of Virginia's certificate-of-need requirement, it does not apply evenhandedly because of special carve-outs for similarly situated services like "nuclear cardiac imaging." (Compl. ¶¶ 109-11.)

Second, Virginia's certificate-of-need review process is unduly complicated and time-consuming. In a 190-day multi-step review process (*Id.* ¶¶ 117-136 & Appendix A), applicants bear the burden of demonstrating a "need" for their proposed services by producing information and evidence that they meet twenty different statutory factors. (Compl. ¶ 113.) Because no one factor is controlling, the Commissioner possesses essentially complete discretion in determining whether or not to grant a certificate of need. (*Id.* ¶ 114.) Worse, Virginia's statutory scheme invites existing businesses to delay the review process and make it more burdensome by intervening to request an "informal fact-finding conference." (*Id.* ¶¶ 133-38.) As Plaintiffs

allege, these fact-finding conferences are almost exclusively requested by entities that would be in economic competition with the applicant for a certificate of need. (*Id.* ¶¶ 137-38.)  As a direct result of this requirement, Plaintiffs and others like them are locked out of the state (*Id.* ¶¶ 168-71, 178, 187-88), and Virginia is largely closed off from interstate commerce in medical equipment (like CT scanners and MRI scanners) or services that are covered by the certificate-of-need program.  (*Id.* ¶¶ 193-97.)

On June 5, 2012, Plaintiffs filed this civil rights action against Defendants in their official capacities requesting declaratory and injunctive relief.[1]  The Complaint claims for violations of (i) the dormant aspect of the Commerce Clause (*id.* ¶¶ 190-211); (ii) the Equal Protection Clause (*id.* ¶¶ 212-19); (iii) the Due Process Clause (*id.* ¶¶ 220-26); and (iv) the Privileges or Immunities Clause (*id.* ¶¶ 227-31).  On June 29, 2012, all Defendants except for Dean Montgomery[2] filed a motion to dismiss for failure to state a claim under Rule 12(b)(6).

## ARGUMENT

The inquiry in a motion to dismiss is straightforward:  A court must take all the facts in the Complaint as true (and make all reasonable inferences in favor of the plaintiffs) and determine whether the Complaint states a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *E. I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 448 (4th Cir.

---

[1] By law, each defendant plays a role in administering the state's certificate-of-need program. (Compl. ¶¶ 17-37.)

[2] The pending motion has been brought on behalf of all defendants represented by the Office of the Attorney General of Virginia—that is, all defendants except for Dean Montgomery.  (Defs.' Mem. at 1 n.1.)  Although Defendant Montgomery is not represented by the Attorney General, he is sued here only in his official capacity as Executive Director of the Health Systems Agency of Northern Virginia, a nonprofit organization established by Virginia to conduct an independent review of certificate-of-need applications in Northern Virginia.  He is named in this suit only in the event he is considered a necessary party to enjoin the operation of the certificate-of-need program.  *Cf.* Fed. R. Civ. P. 19(a) (required joinder of parties).  If all the parties can agree Defendant Montgomery is not a necessary party to this lawsuit, Plaintiffs anticipate he will be dismissed by stipulated agreement.

2011).  Courts need not determine that a plaintiff's victory is probable—only that the facts pled

(if true) entitle the plaintiff to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Applying that standard to Plaintiffs' detailed Complaint requires denying Defendant's motion.

      In urging this Court to grant its motion to dismiss, Defendants misconstrue the governing

caselaw or inappropriately dispute the facts of the Complaint—or, in many cases, both.  Simply

put, Plaintiffs have alleged enough facts to entitle them to relief under each of their claims, and

this Court should not resolve those claims without the benefit of a full factual record.

      Below, Plaintiffs first explain that they have properly pled a violation of the dormant

aspect of the Commerce Clause under two independent theories.  They then turn to Defendants'

arguments against the claims under both the Due Process and Equal Protection Clauses, all of

which are premised on a caricature of the rational-basis test.  Finally, Plaintiffs address their

claim for relief under the Fourteenth Amendment's Privileges or Immunities Clause, which is

concededly foreclosed in this Court, but which Plaintiffs seek to preserve for appellate review.

## I.    THE COMPLAINT SUFFICIENTLY ALLEGES THAT VIRGINIA'S CERTIFICATE-OF-NEED PROGRAM VIOLATES THE DORMANT COMMERCE CLAUSE.

      The Constitution's grant of authority for Congress to regulate interstate commerce has

"long been understood [ ] to provide protection from state legislation inimical to the national

commerce [even] where Congress has not acted . . . ."  *Barclays Bank PLC v. Franchise Tax Bd.*

*of Calif.*, 512 U.S. 298, 310 (1994) (quotation marks and citation omitted).  This "dormant"

Commerce Clause protection has "two tiers, a discrimination tier and an undue burden tier".

*Yamaha Motor Corp. v. Jim's Motorcycle, Inc.*, 401 F.3d 560, 567 (4th Cir. 2005) (citation

omitted).  Under the first, if a state statute either directly regulates interstate commerce or if "its

effect is to favor in-state economic interests over out-of-state economic interests," courts

generally strike it down "without further inquiry."  *Brown-Forman Distillers Corp. v. N. Y. State*

*Liquor Auth.*, 476 U.S. 573, 579 (1986).  Under the second tier, if a statute affects interstate commerce only indirectly, courts must inquire "whether the State's interest [in the regulation] is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."  *Id.* at 579 (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, (1970)).  Both of these inquiries are essentially practical.  *See, e.g., Maine v. Taylor*, 477 U.S. 131, 138 (1986) (describing the first inquiry as one into the law's "practical effect"); *Dep't of Rev. of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (describing *Pike* balancing test). The Complaint clearly alleges sufficient facts supporting relief under both theories.  Both claims must be decided on a full factual record, and Defendants' motion must therefore be denied.

### A.  The Complaint Sufficiently Alleges That Virginia's Certificate-of-Need Program Discriminates Against Interstate Commerce.

Through specific allegations, the Complaint states a plausible claim that Virginia's certificate-of-need program has the purpose of discriminating against interstate commerce in favor of in-state businesses, and it clearly alleges that the program is working—that it actually has the effect of discriminating against out-of-state medical businesses.  (Compl. ¶¶ 200-07.) This claim cannot be resolved on a motion to dismiss because it turns on the "practical effect" Virginia's law has on interstate commerce—and the parties quite plainly disagree about what that practical effect is.  *See, e.g., Maine v. Taylor*, 477 U.S. 131, 138 (1986) (inquiry is whether a state law "discriminate[s] against interstate commerce either on its face or in practical effect" (quotation marks omitted)).

According to the Complaint, the effect of Virginia's certificate-of-need program is to provide existing healthcare providers (*i.e.*, in-state interests) with a government-backed shield from competition.  (Compl. ¶ 103.)  Indeed, according to Virginia's own regulations, a central purpose of the certificate-of-need program is to "discourage[] the proliferation of services that

would undermine the ability of essential community providers to maintain their financial viability." (Compl. ¶ 104 (citing 12 Va. Admin. Code § 5-230-30).) In other words, the program aims to insulate existing in-state businesses from competition. The Complaint also discusses the certificate-of-need application process, the difficulty of which varies depending on whether established in-state businesses exercise their right to intervene in the proceedings. (Compl. ¶¶ 133-34, 136-38.) [3] By granting a quasi-veto power to local business interests, the state sets a thumb—indeed, a whole hand—on the scale in favor of local operators and in opposition to out-of-state businesses seeking to enter into Virginia. (Compl. ¶¶ 200-01.)

Defendants essentially ask the Court to disregard all of these allegations and find that the certificate-of-need program could not possibly discriminate against interstate commerce because the program does not explicitly hinge on an applicant's domicile and because one of the 20 independent factors that must be considered in granting or denying an application is whether the new services would "foster[] institutional competition." (Defs.' Mem. at 21.) Respectfully, these arguments cannot be resolved in a motion to dismiss.

As an initial matter, this Court simply cannot determine what the *practical effect* of Virginia's certificate-of-need requirement is in the absence of facts. Plaintiffs allege that the requirement has the effect of discriminating against interstate commerce—that, in its actual operation, its burdens fall more heavily on out-of-state businesses. Defendants apparently dispute this. And they are entitled to do so—but they are not entitled to have that dispute resolved on a motion to dismiss. *See, e.g., Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir.

---

[3] Ignoring these detailed and specific allegations about the operation of the certificate-of-need process and the way in which it gives special power to in-state businesses, State Defendants' incorrectly assert that Plaintiffs' allegation of protectionist discrimination is "a mere conclusion supported by no allegation of fact or provision of state law." (Defs.' Mem. at 20 citing Compl. at 36-37.)

2007) (discussing difference between motions to dismiss and motions for summary judgment). Indeed, Defendants implicitly concede as much by basing part of their argument on statistics outside the Complaint.[4]

Moreover, Defendants' Motion entirely fails to account for the role established in-state businesses are allowed to play in the certificate-of-need process.[5]  Plaintiffs have alleged that this role is enormous—not just in affecting the *outcome* of an application, but affecting the duration and burden of the application process itself.  (Compl. ¶¶ 126; 133-34; 136-38.)  This fact, in and of itself, would entitle Plaintiffs to relief:  Giving government officials the power to block new businesses for the purpose of protecting the profits of existing in-state businesses is discrimination against interstate commerce.  The First Circuit, for example, has held that a Puerto Rican certificate-of-need requirement "discriminate[d] against interstate commerce by permitting the Secretary [of Health] to block a new pharmacy from locating to its desired location simply because of the adverse competitive effects that the new pharmacy will have on existing pharmacies."  *Walgreen Co. v. Rullan*, 405 F.3d 50, 55 (1st Cir. 2005).  Specifically noting that existing pharmacies "wield substantial influence in the enforcement of the certificate

---

[4]  As evidence of the statute's purported neutrality, Defendants point this Court to statistics on the number of times a certificate of need was granted in fiscal year 2011. (Defs.' Mem. at 21). Of course, the Court cannot consider these on a motion to dismiss, but even if they were relevant here, they do not prove what Defendants argue.  Many medical providers (like Progressive Radiology) fail to complete or even begin the certificate-of-need application process because of the huge costs, delay, and uncertainty involved.  Statistics regarding the acceptance rate of *completed* applications, by definition, fail to account for would-be applicants who were deterred by the enormous burdens of the process.

[5]  Defendants incorrectly state that Plaintiffs fail to allege that "the persons primarily affected by the certificate-of-need process are out-of-state medical service providers, rather than all medical service providers seeking to make certain capital expenditures."  (Defs.' Mem. at 21.)  But Plaintiffs clearly allege how in-state businesses are favored by being allowed an effective veto over any new competition, to the disadvantage of out-of-state businesses. (Compl. ¶¶ 133-38.)

requirement against proposed new pharmacies," the court concluded that this "protectionist regime" had discriminatory effects.  *Id*. at 56.

### B. The Complaint Sufficiently Alleges that Virginia's Certificate-of-Need Program Places Clearly Excessive Burdens on Interstate Commerce.

Even laws that are applied evenhandedly and impose only an incidental burden on interstate commerce are unconstitutional if the burden imposed on interstate commerce is clearly excessive in relation to the putative local benefits.  *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 338-39 (2008) (*citing Pike*, 397 U.S. at 142).  By its very nature, this is a factual inquiry.  Indeed, in the Supreme Court's most recent discussion of the *Pike* test, the Court noted that it was conducting the inquiry based on a record that was built after "protracted discovery." *United Haulers Ass'n  v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 337 (2007). Where, as here, the parties do not agree about either the burden on interstate commerce or about what benefits (if any) the challenged law is actually achieving, *Pike* balancing requires fact-finding—and, therefore, cannot be done in the context of a motion to dismiss.  *Cf. Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 932 (9th Cir. 2011) (reversing district court's Rule 12(c) dismissal of dormant Commerce Clause challenge to state certificate-of-need program and noting that the "ultimate question of whether the [ ] regulations survive *Pike* scrutiny [was] not before" the court at that stage of the litigation).

The Complaint is clear:  Plaintiffs specifically allege that there is a thriving interstate market in CT and MRI scanners.  (Compl. ¶¶ 194-196.)  Because no one in Virginia can purchase a CT or MRI scanner without obtaining a certificate of need, the flow of those goods into Virginia is substantially burdened or restricted.  (*Id*. ¶ 197.)  Furthermore, Plaintiffs allege the existence of an interstate market in medical services, including colon-cancer screening and treatment and radiology services.  (*Id*. ¶ 198.)  In addition to preventing Plaintiffs, their

employees, and their patients from moving across state lines, Virginia's certificate-of-need program prevents all out-of-state medical providers from offering independent services without first obtaining a certificate of need.  (*Id.* ¶ 199.)  And they allege that this does not actually achieve any local benefits.  (*Id.* ¶¶ 202, 208-09.)  This is enough—more than enough—to state a plausible claim under the dormant Commerce Clause.  *See, e.g., Medigen of Kentucky, Inc. v. Public Service Comm'n of West Virginia*, 985 F.2d 164 (4th Cir. 1993) (affirming district court's judgment after trial that state law requiring transporters of medical waste to obtain a certificate of convenience and necessity placed an undue burden on interstate commerce).

Defendants, again, ask the Court to simply disregard these allegations.  They ask the Court to assume that the certificate-of-need program can be justified because it "reduc[es] health care costs in Virginia by preventing wasteful redundancy resulting from unnecessary capital medical expenditures" (Defs.' Mem. at 22)—but the Complaint does not allege that.  Defendants may certainly advance their vision of the facts at summary judgment or trial, but at this stage, they are bound by the Complaint.  And the Complaint alleges that the certificate-of-need program *fails* to achieve these purported local benefits.  (Compl. ¶¶ 96-99, 202, 208-09.)

Defendants further ask the Court to assume that the burden on interstate commerce is small because Plaintiffs are "relatively small businesses" that want to purchase "at most[] a couple of MRI machines or CT scanners from out of state."  (Defs.' Mem. at 22.)  But this argument gets the inquiry entirely wrong.  The question before the Court is not whether Plaintiffs, themselves, are engaged in a lot of interstate commerce.  The question is whether the challenged law imposes substantial burdens on *interstate commerce* itself, not on the particular

Plaintiffs.[6]  *See, e.g., Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127-28 (1978) (the dormant Commerce Clause "protects the interstate market, not particular interstate firms").  The Complaint clearly alleges that both that the law imposes these burdens and how it does so (*e.g.*, Compl. ¶¶ 193-99), and the Complaint clearly alleges that it fails to achieve any benefits that might justify these burdens.  (*id.* ¶¶ 202, 208-09.)  Defendants' motion must therefore be denied.

## II.   THE COMPLAINT SUFFICIENTLY ALLEGES THAT THERE IS NO RATIONAL BASIS FOR THE CERTIFICATE-OF-NEED PROGRAM OR FOR ITS UNEQUAL APPLICATION.

The Complaint also alleges violations of the Fourteenth Amendment's Equal Protection and Due Process Clauses, stating that Virginia arbitrarily applies its certificate-of-need requirement to some things but not others, and that the certificate-of-need program itself does not rationally advance a legitimate state interest.  Both of these claims are subject to the well-known rational-basis test.  *See, e.g., United States Dept. of Agric. v. Moreno*, 413 U.S. 528, 533 (1973) ("Under traditional equal protection analysis, a legislative classification must be sustained if the classification itself is rationally related to a legitimate governmental interest.").  Defendants' motion, however, does not ask this Court to apply the rational-basis test.  Instead—citing almost exclusively to cases decided at summary judgment or after trial—it asks the Court to dismiss this case by applying a caricature of the rational-basis test under which facts never matter and the government always wins.

To be sure, rational-basis review is deferential, but it is not "toothless."  *Logan v. Zimmerman Brush, Co.*, 455 U.S. 422, 439 (1982) (Blackmun, J., concurring); *Brown v. N. C. DMV*, 166 F.3d 698, 706 (4th Cir. 1999) ("It is true, of course, that even rational basis review

---

[6] It is worth noting that, under Defendants' theory, smaller providers like Plaintiffs would not be able to state a *Pike* claim here, but the large corporations (such as Sharp or General Electric) that actually make and sell medical devices would be able to.  Plaintiffs can find no support in the caselaw for this strikingly unfair proposition.

places limitations on states."); *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000) ("[r]ational

basis review is not a rubber stamp of all legislative action . . . ."). Rational-basis plaintiffs carry

a heavy burden, but it is not an *impossible* burden, and this Court should reject Defendants'

attempt to deprive Plaintiffs of their opportunity to create a factual record in support of their

rational-basis claims.

From its earliest articulations of the rational-basis test, the Supreme Court has been clear

that plaintiffs have the right to introduce evidence demonstrating that a law lacks any rational

basis in reality. *See, e.g., United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938)

("Where the existence of a rational basis for legislation whose constitutionality is attacked

depends upon facts beyond the sphere of judicial notice, such facts may properly be made the

subject of judicial inquiry, and the constitutionality of a statute predicated upon the existence of a

particular state of facts may be challenged by showing to the court that those facts have ceased to

exist." (internal citations omitted)). While the presumption of constitutionality of legislation is

strong, it is nonetheless rebuttable by evidence—and, while courts are allowed to presume the

legitimacy of legislation in the absence of contrary evidence, that very presumption assumes that

plaintiffs will be given the opportunity to *introduce* that contrary evidence and create a record for

the court to review.[7]  *See, e.g., Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464

(1981) ("parties challenging legislation under the Equal Protection Clause may introduce

---

[7] *Cf. Giarratano v. Johnson*, 521 F.3d 298, 304 (4th Cir. 2008) (holding that a mere conclusory recitation that a statute is "without rational basis" cannot survive a Rule 12(b)(6) motion where the rational basis is "readily apparent"). As demonstrated repeatedly throughout this brief, however, Plaintiffs' detailed 40-page complaint is anything but conclusory, and Plaintiffs are entitled to prove the truth of their case. *Cf. High Peak Partners, LLC v. Bd. of Supervisors of Prince George Cty.,* 2008 WL 1733605, *11, 2008 U.S. Dist. LEXIS 30415, at *31 (E.D. Va. Apr. 14, 2008) (although recognizing that plaintiffs bear heavy burden of "negating every conceivable basis" and defendant's briefs had set forth a rational basis, plaintiffs "benefit from a more tempered standard of review at [the motion-to-dismiss] stage in the litigation").

evidence supporting their claim that it is irrational"); *Weinberger v. Wiesenfeld*, 420 U.S. 636,

649 n.16 (1975) ("This Court need not in equal protection cases accept at face value assertions of

legislative purposes when an examination of the legislative scheme and its history demonstrates

that the asserted purpose could not have been a goal of the legislation.").

This means that, however heavy Plaintiffs' burden on these claims may be, Plaintiffs are

entitled to try to meet that burden.  Dismissing a well-pleaded claim simply because it is subject

to rational-basis review would short-circuit judicial review entirely.  Indeed, it is telling that, of

all the cases Defendants rely on substantively in their briefs, only *one* is in the context of a Rule

12(b)(6) motion.  (*See* Defs.' Mem. at 11, 13 (citing *Star Scientific, Inc. v. Beales*, 278 F.3d 339

(4th Cir. 2002)).  Every other citation is to a case decided at summary judgment or after trial—in

other words, after exactly the sort of discovery and fact-finding Defendants are trying to prevent

here.  And *Star Scientific* is simply inapposite here:  That case was a challenge to a Virginia

statute implementing the Master Settlement Agreement that grew out of multiple states' lawsuit

against the country's major tobacco manufacturers.  278 F.3d at 344-47.  Under that law, tobacco

manufacturers that did not participate in the Agreement were required to set aside a certain

amount of money in escrow to ensure that they would not be judgment-proof in the event

Virginia subsequently brought a claim against them for the health consequences of their

cigarettes.  *Id.* at 346.  In that case, the logical connection between the means (ensuring the

companies could pay a future judgment) and the ends (forcing the companies to set aside funds

to do so) was plain from the face of the Complaint.  And the plaintiffs in that case did not allege

that the statute did not rationally advance this purpose—instead they argued that the law was

illegitimate because it was meant to coerce them into effectively signing the Agreement (or to

unconstitutionally deprive them of the effect of their refusal to do so).  *Id.* at 347-51.  They did

19

not argue (nor could they have) that the law did not actually have the effect of setting aside money that could compensate Virginia for the health effects of their cigarettes or that facts would show that their cigarettes did not have any negative health effects. *Id.* at 361 ("[Star Scientific] cannot deny that it is a cigarette manufacturer whose products will continue to threaten the public health. [And] it does not suggest any such denial . . . .").[8]

Here, by contrast, Plaintiffs *do* allege that the certificate-of-need requirement arbitrarily applies to some medical services and devices, but not to other services and devices that are indistinguishable in any relevant way. Plaintiffs do allege that the facts will show that the certificate-of-need program cannot rationally be thought to advance a legitimate government interest. They are entitled to build a factual record to demonstrate these things to the Court.

## A. The Complaint States a Claim Under the Equal Protection Clause.

The crux of Plaintiffs' Equal Protection Claim is that the burdens of the certificate-of-need program fall on some people (like Plaintiffs) but not on other similarly situated people (like, for example, people who want to take nuclear images of the heart instead of computerized x-rays of the abdomen). (Compl. ¶¶ 212-19.) Plaintiffs have alleged that there is no rational basis for drawing these particular distinctions. (*Id.*)

Defendants' argument urging this Court to dismiss the Equal Protection claim is full of rhetoric about the importance of judicial deference, but it is devoid of one thing: a factual basis for the distinction drawn by the legislature. (Defs.' Mem. at 14-17.) Indeed, the closest Defendants come to explaining why the law draws the distinctions it does is suggesting that "the Virginia General Assembly may rationally distinguish between medical equipment and services

---

[8] For the same reason, *Star Scientific* dismissed claims under the Commerce Clause, despite the factual nature of that inquiry—because the Complaint itself made plain what the law's purpose was and that the purpose was actually being achieved without placing any significant burden on interstate commerce. *Id.* at 354-57.

necessitating significant capital expenditures and those that do not." (Defs.' Mem. at 16.) But this is just a factual assertion—a claim that the law draws a line between more expensive equipment and less expensive equipment, with the certificate-of-need requirement applying to the former. It is not, however, a factual assertion drawn from the Complaint,[9] and therefore cannot be the basis of a motion to dismiss. Similarly, Defendants' other suggestions (that demand for nuclear cardiac imaging might be very great or that nuclear cardiac imaging has been deregulated as an experiment) are factual in nature, and should be subject to factual rebuttal at trial or summary judgment.

The Complaint alleges that the law applies to some things, but not other things, and that there is no rational distinction between these things. Defendant suggests that this is insufficient in light of the Plaintiffs' stated burden to "negative every conceivable basis which might support" the law's distinctions. (Defs.' Mem. at 16.) But surely plaintiffs cannot be expected to file (and courts cannot be expected to tolerate) complaints featuring an endless litany of possible rational bases coupled with an allegation that they are false. In addition to negating several possible rationales (Compl. ¶ 41), Plaintiffs' Complaint goes beyond mere conclusory allegations to point to specific equipment they will be able to demonstrate is similarly situated, yet treated differently. (Compl. ¶¶ 109-11; 212-219.) Rule 8's requirement of a "short, plain statement" of the underlying facts requires no more.

### B. The Complaint States a Claim Under the Due Process Clause.

The Complaint plausibly alleges that the certificate-of-need program violates the Due Process Clause in three independent ways: (1) there is no logical connection between the program and any legitimate interest; (2) the public harm imposed by the program so vastly

---

[9] Plaintiffs did not allege this because, to the best of their knowledge, it is not true.

overshadows any public benefit as to render the program irrational; and (3) the program achieves nothing beyond economic protectionism (an illegitimate state interest).

> **1.    The Complaint Sufficiently Alleges That There is No Logical Connection Between Restricting the Supply of Medical Facilities and Decreasing Medical Costs or Increasing Access to Medical Care.**

A law will fail rational-basis review when there is no logical connection between the government's actions and the government interest (or interests) proffered in support of it.  *See, e.g.*, *Williams v. Vermont*, 472 U.S. 14, 23-25 (1985) (holding that Vermont had legitimate interest in encouraging its residents to purchase cars within the state, but there was no logical connection between that interest and the State's attempt to levy a tax on a car purchased out of state before its owner had even moved to Vermont).  In such circumstances, invalidation of the classification is appropriate—deference to legislatures notwithstanding—because an utter absence of logic renders a statutory scheme arbitrary.  The authority to legislate has never been understood to include the power to legislate arbitrarily. [10]

For example, in *Zobel v. Williams*, 457 U.S. 55, 60-62 (1982), plaintiffs brought an equal-protection challenge to an Alaskan program that distributed oil revenue each year to citizens based on the length of their state residency.  For every year of Alaska residency since 1959, residents were entitled to one share of the dividends of the state's oil fund.  *Id.* at 56-57.  In other words, people who had moved to Alaska earlier would receive a special windfall

---

[10] *See also Quinn v. Millsap*, 491 U.S. 95, 108 (1989) (finding no logical connection between an individual's ability to understand politics and an individual's ownership or non-ownership of land); *Chappelle v. Greater Baton Rouge Airport Dist.*, 431 U.S. 159 (1977) (same); *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973) (finding no logical connection between stimulating the agricultural economy and providing food stamps only to households containing people who are related to one another); *Mayer v. City of Chicago*, 404 U.S. 189, 196 (1971) (finding, where the government had adopted a policy that inability to pay was not a sufficient reason to deny a transcript to a felony defendant, there was no logical reason that policy should not extend to a misdemeanor defendant); *Turner v. Fouche*, 396 U.S. 346, 363-64 (1970) (finding no logical connection between fitness for political office and property ownership).

payment—forever.  A group of latter-day Alaskans brought suit, alleging that this permanent

classification between *bona fide* residents violated the Equal Protection Clause.  *Id.* at 57-58.

Alaska proffered two possible rationales in defense of its unequal treatment of earlier and

later residents that the Court rejected on logical grounds.  The State argued that the windfall of

oil money to earlier residents:  (1) encouraged others to move to Alaska; and (2) gave residents a

stake in the prudent management of oil reserves.  *Id.* at 61.  Alaska's asserted interests—growing

its population and managing its natural resources—were clearly legitimate, but the Supreme

Court nonetheless invalidated the distinction because there was no logical connection between

those interests and the challenged law.  *Id.* at 61-63.  Giving more oil money to people who

already lived in Alaska obviously would not incentivize *new* people to move to Alaska, since

new residents were categorically excluded from receiving oil money.  And preserving natural

resources by giving Alaskans a financial stake in their use is surely a legitimate interest—but not

one that justifies giving that financial stake to *some* Alaskans while arbitrarily excluding others.

In the same vein, Plaintiffs allege that there is no logical connection between restricting

supply of medical facilities, on the one hand, and increasing access to medical care or decreasing

medical costs, on the other.  Indeed, in striking down a similar government certificate

requirement for transporters of medical waste, the Fourth Circuit recognized the inherent

contradiction between limiting supply and any attempt to increase access or decrease cost:

> Restricting market entry [ ] necessarily *limits* the available service because it limits
> the number of medical waste transporters from which a medical waste generator can
> seek service.  Moreover, restricting market entry does nothing to insure that services
> are provided at reasonable prices.

*Medigen*, 985 F.2d at 167.

Plaintiffs' Complaint buttresses this intuitive view of market entry by specifically

alleging that certificate-of-need programs have failed to increase access to healthcare or decrease

costs.  (*E.g.*, Compl. ¶¶ 96 -99.)  Additionally, Plaintiffs show the lack of any logical connection

by alleging that there have been no negative effects in the 14 states that have entirely eliminated

their certificate-of-need programs.  (*Id.*  ¶ 102.)  Although a law is not unconstitutional under the

rational-basis test merely because it is ineffective, the documented failure of certificate-of-need

programs to achieve these goals dramatically undermines the goals' plausibility.  To borrow an

adage, the very definition of irrationality is repeating the same mistake over and over again and

expecting a different result.  Finally, the Complaint alleges that there is no logical connection to

a legitimate interest because a primary motivating rationale for certificate-of-need programs was

eliminated in 1984 when Congress restructured the Medicare/Medicaid reimbursement system to

a fee-for-service system.  (Compl. ¶¶ 93, 95, 96.)[11]

　　To be sure, Plaintiffs will be required to *prove* that the certificate-of-need program does

not, in fact, have any plausible connection to increased access to medical care or reduced

medical costs.  But all they are required to do at this stage is allege specific facts that show the

lack of any plausible connection.  They have done so.

### 2.  The Complaint Sufficiently Alleges That the Public Harm Imposed By The Certificate-of-Need Program Vastly Outweighs Any Plausible Public Benefit.

　　The Supreme Court has also held that laws fail the rational-basis test when the

government's proffered justifications—such as saving money—are so wildly out of proportion

---

[11] The Supreme Court has recognized that changed circumstances can render a once-rational law, irrational.  This is indeed what happened in the seminal rational-basis decision in *Carolene Products*.  *Compare United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 (1938) *with Milnot Co. v. Richardson*, 350 F. Supp. 221, 224-25 (S.D. Ill. 1972).  *See also Leary v. United States*, 395 U.S. 6, 38 n.68 (1969) (a statute is subject to constitutional attack if legislative facts upon which statute was based no longer exist);  *Nashville, C. & St. L. Ry. v. Walters*, 294 U.S. 405, 415 (1935) ("[a] statute valid when enacted may become invalid by change in the conditions to which it is applied"); *Chastleton Corp. v. Sinclair*, 264 U.S. 543, 547 (1924) ("[a] Court is not at liberty to shut its eyes to an obvious mistake, when the validity of the law depends upon the truth of what is declared").

with the harm caused by the classification that no rational legislator would countenance them. For example, in *Plyler v. Doe*, the government asserted that denying public education to the children of illegal immigrants could help save government funds, which the Court rejected as a "wholly insubstantial [benefit] in light of the costs involved to these children, the State, and the Nation" of creating a subclass of illiterates.  457 U.S. 202, 230 (1982). [12]

Here, Plaintiffs not only allege that certificate-of-need programs do not result in the purported benefits of decreased healthcare costs or increased access to medical services (Compl. ¶¶ 96-99), but Plaintiffs detail how Virginia's certificate-of-need program prevents lifesaving and cost-effective medical services from being offered to patients in Virginia. (Compl. ¶¶ 48-50, 66, 73, 74, 86.)  These allegations are enough to state a plausible claim that Virginia's certificate-of-need program is irrational because its harms vastly outweigh any purported benefits.

### 3.  The Complaint Alleges That Virginia's Certificate-of-Need Program Only Achieves an Illegitimate End:  Economic Protectionism.

Finally, courts reject laws that seek to advance illegitimate ends like animus or sheer favoritism for its own sake.  The constitutional impermissibility of this kind of naked preference is well illustrated in *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973).  In that case, the Supreme Court held that the government could not justify withholding benefits from households made up of unrelated people based on sheer dislike of "hippies."  *Id.* at 534.  In other words, government must justify its actions by pointing to something beyond a simple desire to

---

[12] *See also James v. Strange*, 407 U.S. 128, 141-42 (1972) (holding that the state funds saved by denying indigent defendants exceptions to the enforcement of debt judgments was grossly disproportionate to the harms it inflicts on debtors); *Lindsey v. Normet*, 405 U.S. 56, 77-78 (1972) (holding that the cost savings from deterring a few frivolous appeals were insufficient to justify a surety requirement that allowed many frivolous appeals, blocked many meritorious appeals, and showered a windfall on landlords); *Reed v. Reed*, 404 U.S. 71, 76-77 (1971) (holding that attempting to reduce the workload of the probate courts by excluding women from service as estate administrators in certain cases would be unconstitutionally arbitrary).

harm or favor a discrete group.[13]   *Cf.* Cass R. Sunstein, *Naked Preferences and the Constitution*, 84 Colum. L. Rev. 1689, 1689 (1984) (coining the term "naked preference" to describe "the distribution of resources or opportunities to one group rather than another solely on the ground that those favored have exercised the raw political power to obtain what they want").

Here, Plaintiffs allege that Virginia's certificate-of-need program cannot plausibly be seen as accomplishing anything except providing economic protection for favored business interests.  (Compl. ¶¶ 223-24.)  Specifically, Plaintiffs allege that Virginia only requires Plaintiffs to obtain a certificate of need because they plan to open facilities that would compete with established facilities, instead of working for an established business in Virginia that already own the necessary equipment.  (*Id*. ¶ 43.)  And Plaintiffs explain why other rationales, such as protecting public health or safety or promoting fiscal accountability, are not plausible.  (*Id*. ¶ 41.)

Simple economic protectionism cannot be a legitimate basis for government action, and a number of federal courts have struck down legislation for that reason—even under the deferential rational-basis test.  *See Merrifield v. Lockyer*, 547 F.3d 978, 991-92 & n. 15 (9th Cir. 2008) (finding no rational basis beyond illegitimate protectionism for pest-handling rules); *Craigmiles v. Giles*, 312 F.3d 220, 224, 228-29 (6th Cir. 2002) (finding no rational basis beyond illegitimate protectionism for casket-sales regulations); *Santos v. City of Houston*, 852 F. Supp. 601, 607-09 (S.D. Tex. 1994) (finding no rational basis for anti-jitney law); *Cornwell v. Cal. Bd.*

---

[13] *See also Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (finding no legitimate interest in criminalizing consensual adult homosexual acts); *Cleburne*, 473 U.S. at 448 (rejecting sheer dislike of people with mental retardation as legitimate government interest); *Romer v. Evans*, 517 U.S. 620, 634 (1996) (finding no legitimate interest in anti-gay animus); *Hooper v. Bernalillo Cnty. Assessor*, 472 U.S. 612, 623 (1985) (finding no legitimate interest in creating different classes of *bona fide* residents); *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 880 (1985) (finding no legitimate interest in discriminating against out-of-state companies); *Zobel v. Williams*, 457 U.S. 55, 65 (1982) (finding no legitimate interest in creating permanent classes of *bona fide* residents).

*of Barbering & Cosmetology*, 962 F. Supp. 1260, 1273-74 (S.D. Cal. 1997) (denying

government's motion to dismiss rational-basis challenge to hairbraiding regulations); *but see*

*Powers v. Harris*, 379 F.3d 1208, 1221 (10th Cir. 2004) (disagreeing and noting that "while

baseball may be the national pastime of the citizenry, dishing out special economic benefits to

certain in-state industries remains the favored pastime of state and local governments."). Again,

Plaintiffs do not deny that they will have to prove their case—and bear a heavy burden in doing

so. But they have alleged specific facts in their Complaint showing that the certificate-of-need

requirement advances no legitimate government end beyond mere protectionism, and they (like

the plaintiffs in all the cases cited above) are entitled to build a record to prove their allegations.

### III.  PLAINTIFFS ARE PRESERVING THEIR PRIVILEGES OR IMMUNITIES CLAIM UNDER THE FOURTEENTH AMENDMENT.

Finally, Plaintiffs have alleged that Virginia's certificate-of-need program violates their

right to earn an honest living under the Privileges or Immunities Clause of the Fourteenth

Amendment. (Compl. ¶¶ 227-31.) There can be little dispute that the Supreme Court's decision

in the *Slaughter-House Cases* forecloses this claim, as it essentially rendered the Privileges or

Immunities Clause "a vain and idle enactment, which accomplished nothing." 83 U.S. 36, 96

(1873) (Field, J., dissenting). While Plaintiffs acknowledge that this Court is bound by the

*Slaughter-House Cases*, they nonetheless seek to preserve this argument for further appellate

review.

There is perhaps no proposition in American constitutional law on which there is greater

unanimity than that the *Slaughter-House* majority is incorrect. As one scholar notes, "everyone"

agrees on this point. Richard L. Aynes, *Constricting the Law of Freedom: Justice Miller, the*

*Fourteenth Amendment, and the Slaughter-House Cases*, 70 Chi.-Kent L. Rev. 627, 627 (1994);

*see also* Laurence H. Tribe, American Constitutional Law 1320-21 (3d ed. 2000) ("The textual

and historical case for treating the Privileges or Immunities Clause as the primary source of federal protection from state rights-infringement is very powerful indeed."); Akhil Reed Amar, The Bill of Rights 213 (1998) (explaining "[t]he obvious inadequacy—on virtually any reading of the Fourteenth Amendment—of Miller's opinion" in *Slaughter-House*).

And Supreme Court Justices have also expressed interest in revisiting the Privileges or Immunities Clause "in an appropriate case." *See, e.g., Saenz v. Roe*, 526 U.S. 489, 527-28 (1999) (Thomas, J., dissenting). Most recently in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), a majority of the Court declined to address the question, concluding that doing so was unnecessary for the outcome of the case. In *McDonald*, four justices voted to strike down Chicago's handgun ban, finding that the Second Amendment right to keep and bear arms was applicable to the States through "substantive due process." Four justices disagreed and wanted to uphold the ban.

The pivotal fifth vote in *McDonald*, though, was Justice Thomas, who noted that, for all the disagreement between the two groups of four Justices, "neither side argues that the meaning they attribute to the Due Process Clause was consistent with public understanding at the time of its ratification." *McDonald*, 130 S. Ct. at 3062 (Thomas, J., concurring). Justice Thomas agreed that the gun ban should be struck down, but instead proposed "a more straightforward path to this conclusion, one that is more faithful to the Fourteenth Amendment's text and history"— namely, the Fourteenth Amendment's "Privileges or Immunities Clause." *Id*. at 3058-59.

The most important point from *McDonald* for purposes of this case is that the Court left the door open to restoring the Privileges or Immunities Clause to its rightful place in the Fourteenth Amendment in a future case. As one court noted, after thoughtful consideration of the relevant history, "it may be time, as Justice Thomas suggests in *Saenz*, to take another look at

28

the Privileges [or] Immunities Clause and its place within the Fourteenth Amendment."

*Craigmiles v. Giles*, 110 F. Supp. 2d 658, 667 (E.D. Tenn. 2000), *aff'd* 312 F.3d 220 (6th Cir.

2002).  The only way for that to happen is for parties to assert and preserve Privileges or

Immunities claims in appropriate cases, like this one.

## <u>CONCLUSION</u>

For the foregoing reasons, State Defendants' motion to dismiss should be denied.


Dated this 13th day of July, 2012.

Respectfully submitted,

**INSTITUTE FOR JUSTICE**


By:  /s/ Robert McNamara_____
William H. Mellor* (DC Bar No. 462072)
Robert J. McNamara (VA Bar No. 73208)
Darpana M. Sheth* (NY Bar No. 4287918)
Lawrence G. Salzman* (CA Bar No. 224727)
901 North Glebe Road, Suite 900
Arlington, VA 22203
Tel:  (703) 682-9320
Fax:  (703) 682-9321
E-mail:  rmcnamara@ij.org; wmellor@ij.org;
dsheth@ij.org; lsalzman@ij.org

*Attorneys for Plaintiffs*

*\* Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of July, 2012, I electronically filed the

foregoing **PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO**

**DISMISS** with the Clerk of the Court using the CM/ECF system, which will send a notification of

such filing (NEF) to the following counsel of record:

E. Duncan Getchell, Jr.
Solicitor General of Virginia
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Tel:  (804) 786-7240
Fax:  (804) 371-0200
Email: dgetchell@oag.state.va.us

Michael H. Brady
Office of the Attorney General
900 East Main Street
Richmond, VA 23219
Tel:  (804) 786- 3518
Fax:  (804) 371-0200
Email:  mbrady@oag.state.va.us

*Attorneys for State Defendants*

And I hereby certify that I have mailed by United States Postal Service the document to the following
non-CM/ECF participant:

Dean Montgomery, in his official capacity as Executive Director of Health Systems Agency for
Northern Virginia, Inc.
7245 Arlington Boulevard, Suite 300
Falls Church, VA 22042

        _/s/ Robert McNamara_____
        **INSTITUTE FOR JUSTICE**
        Robert J. McNamara (VA Bar No. 73208)
        901 North Glebe Road, Suite 900
        Arlington, VA 22203
        Tel:  (703) 682-9320
        Fax:  (703) 682-9321
        E-mail:  rmcnamara@ij.org

        *Attorneys for Plaintiffs*